18-4036 U.S.A. et al. v. Board of Commissioners of Hamilton County et al. Oral argument not to exceed 15 minutes per side and Mr. Herzig for the record on behalf of appellant city of Cincinnati I'd like to reserve three minutes for rebuttal please. This case, your honors, is about the limits of federal judicial power. Here the district court claimed expansive and extraordinary power to impose a contract on the city, forcing it to remain bound indefinitely to the terms of a contract that had expired and that it no longer agrees to be a party to. Well, it's not indefinite. I mean, it's a temporary injunction. Your honor, there's no end date in the injunction. It says until further court order. We are now in August. The injunction was entered in September of last year. There have been no additional proceedings below. I think that makes it indefinite and permanent. And certainly the rule that the court is imposing here suggests that it could be indefinite. Well, but it appears to me to be part of a process of having mediation resolve all of this. And if you want mediation to be resolved, you can preserve the possibility that each side has something to give and something to take. And if you, it appears like you're trying to take something off the table, but that's not the same thing as saying that the end of this mediation will mean that they're stuck in this contract forever. I can't imagine anyone reading this record and say that's what's anticipated. And so for you to say, oh, this means that this is a permanent injunction, that we're stuck in this contract forever, is just not, doesn't seem to be a fair characterization of what the district court did. I would say two things, your honor. One, even if it's, first of all, I appreciate what you say about the record and the fact that it couldn't last forever. The term of the 1968 agreement, as we call it, was 50 years. Those 50 years are up and this contract has expired. So there has to be something new that follows that. I'm sorry, your honor? There's also a consent judgment. There is a consent decree under which we are operating the district. The second thing I would say, your honor, is that whether permanent or preliminary, it's now lasted, at this point, more than ten months. There has been no action below. And I think part of why we are here is because we do need this court to break the log jam. If, because I think what you'll see in the record below, although it comes after the motion that is at issue here, it's 1649 in the docket, the county has moved to essentially take over the system, citing the same authority that we challenge here today. If this court were to say that the trial court can extend the terms of a contract, can impose a new contract, essentially, on the city of Cincinnati without its consent after it has expired. The consent is interpreted to be, pardon me for interrupting, the consent is interpreted to be from the consent decree. Consent decree gives certain powers, and if one of those powers is to extend the agreement, then the consent comes in the consent decree, not in the agreement. So it's just sort of circular to say, well, the consent decree can't be a basis for extending the agreement. Your honor, if the consent decree said that it could, I would absolutely agree with you. Well, but that's what we're here to argue about. But it doesn't answer it to say, well, it was an agreement that expired. The question is whether they can extend it under the consent decree. I think it does, your honor. I think when you look at Stott's and Vanguard and the other cases, the rule in this circuit and the Supreme Court is pretty clear that where a contract, like the 1968 agreement, precedes the consent decree, you don't just assume that the consent decree automatically amended the 1968 agreement. That's essentially what that argument would be, your honor. Well, I don't know if he stated it more strongly than the district court appeared to express. He didn't say this is automatically extended, it goes on forever now because of the consent decree. He says in order to maintain the terms of the consent decree, we need some mediation. And one of the things that has to be resolved is the underlying agreement. So if you say, well, we're going to take part of that and take it off the table, it gets in the way of resolving this dispute. Your honor, what I would say is the court already took off the table a very important part of the negotiation that would happen between the city and the county. If the city, if the court can keep the city in this agreement, the county has no real incentive to negotiate. That's evidenced, again, at 1649 in the record, where they've asked now under the same power for a takeover, and we haven't had negotiations. What we have below are two other motions pending, one asking for, well, we're stuck under this 1968 agreement. Please tell us how we're supposed to operate, because there remain disputes about that. But two, this motion from the county saying, use that same power to allow us to take over the system. What's taken off the table for the city is the ability to say, no, we're done with this arrangement. We get to move on to a new one, now let's negotiate from that posture. And so, in my view, your honor, that's what the district court took off the table for the city in the first instance. Well, how does the county, what is your proposal as to how the county and city will comply with the consent decree if this agreement goes away? So I think, your honor, first of all, it's important to note that the consent decree and the 1968 agreement are two very different documents. The consent decree, the city is a defendant in the consent decree, the county is a defendant in the consent decree. The court has all kinds of power if a violation is imminent to impose terms to make sure it doesn't happen. But no violation is imminent here. There is no record to suggest that it is imminent here. The court made no findings of fact here. It did not describe at all what its concern was about the consent decree, except to say that it wanted us to stay in this posture. Well, I'm just asking as a practical matter, what would happen if the agreement ended? What would the county do? What would the city do? What I would say, your honor, is that, and as a matter of contract law, we go back to where we were in 1968. We can have two separate systems. There are very good examples for how this works already. The greater Cincinnati water works, as an example, provides water service to the region and then contracts. That's a model, right? You're not saying that would ipso facto be the case. No, it would not, your honor. You still have to negotiate, right? Well, we do, absolutely. It's an argument as to who has the stronger position in the negotiation. We do, absolutely, your honor. I think right now, though, I think your framing of the negotiations is important and correct. But I think, in my view, you're seeing it the wrong way. In my view, the district court put the city at a severe disadvantage in these negotiations. And part of how you can see that is the fact that we are now ten months later. The county has asked for an even more drastic remedy. And the city is stuck with, part of the challenge with the 1968 agreement is the monitoring system and the rules and regulations that the county has imposed that the city believes to be ultra-viris, to be outside the 1968 agreement. And we are stuck with those right now. It is part of what is causing the log jam between these two governments. And part of what we offered, and you see this in our briefing and in the record, was we'll keep providing service just as we are under all the other terms that we are while we negotiate. As long as we get rid of these ultra-viris items from the county, the county refused and then moved for this injunction that we're reviewing today. But I think you're exactly right, your honor. I guess I'd ask you to take a look at the flip side of it and see what's been taken away from the city by the fact of this ruling. I think, your honors, I understand you're concerned about- But rather, it's still in the mix and I want to keep it in the mix, rather than rule on it the other way. Keep what? Keep in the mix the idea that they'll continue to work together, your honor? Yeah. I don't think that's ever been off the table at this point. And the city's not saying it will stop working with the county, it's just that the relationship has to change. And one of the models that makes a lot of sense is a model you see in this area and others where one government provides by contract services to the other. The city, though, remains bound in a contract that it does not want to be a part of anymore. What the court said at page four of its opinion is, there is no defect in the terms of the MSD operating agreement itself. Respectfully, that's not for a judge to decide, that's for the parties to the contract to decide. The judge doesn't get to tell us whether our contract is good for us or not, and that's what happened here. And while I understand that you might say that it's not permanent, that it might be preliminary, it's certainly for the city at this point, ten months later with no additional negotiations and no action on these other items, feels as though it is permanent. And I do think you have an important role to play in breaking that log jam. My concern would be that if you end up with a decision that the county could read to say, yes, the court has this power to impose a contract on us that has expired and that we no longer agree to, then the court has essentially unlimited power to continue to keep the city in whatever arrangement the court sees as most appropriate. That's not what the- It has to be pursuant to the consent decree. But the consent decree, your honor, doesn't speak to how we comply with the consent decree. It talks about the city as an agent of the county, right? It does, which of course is based on the 1968 agreement that preceded it. Right. And if I could- It's the consent decree that's based on that, right? Well, so your honor, I think it's clear from Stotz and Vanguard and the other cases that we cite that in fact, the way to read that properly is that it did not amend- what you're really saying is that the 2004 consent decree amended the 1968 agreement. And unbeknownst to the city- Yeah, but he doesn't say that and I don't read it that way. So you can say that's what it is. But isn't that the implication, your honor? That if he can keep us in disagreement- Not at all. It looks to me like they're trying to- he's trying to get a negotiation. He says there's all this stuff. There's these various counter arguments and we need to work it out. And you want to do something unilaterally which would give you a lot more clout in the negotiation and it's not workable now. It would have to be subject to further negotiation. So all we're talking about is the nature of further negotiation. And I don't want to start. The judge is thinking start relying on sort of rigid legal arguments to take certain things off the table for one party as opposed to the other rather than working them out. And the way that you respond to that is to say, well, we're entitled to it. So we want this now. We want this off the table. Then we'll negotiate. Because you have to negotiate, right? I mean, you can't- this thing can't go on like this. Right, your honor. And we've committed to continue complying with the consent decree and continue providing the county with the services it needs until it decides how it wants to proceed with its system. But of course, we- when you mentioned that we rely on rigid legal arguments, that's I think what we're here to do, your honor, is to look at the law- As subject to the consent decree. Except that it's the other way around, your honor. The 1968 agreement comes first. The consent decree is entered into knowing that it is a 50-year term and that it will expire before the consent decree is ever complied with by the parties. So I think to say that- Language in the consent decree that you would rely upon to say that the parties in entering that consent decree understood that the agreement was going to end? I think, your honor, it's the other way around. The fact that there is no language modifying the 1968 agreement is important. There is no language that refers specifically to the 1968 agreement and says it's going to continue for the future of the consent decree. The parties could have negotiated that surely. They could have said- There is a reference to the agreement in section 2E. It says, pursuant to the agreement, the city also serves as the agent for the county. Right. Is that the only reference to the agreement in the consent decree? No, it does reference it, your honor, because of course it's the basis for it. What it doesn't do is amend it. The parties sat down for years and negotiated with each other and the federal government and the other regulators and did not explicitly amend the 1968 agreement. They went in there assuming that it would end in 2018, which it did, and that the consent decree would need to be complied with thereafter. The parties- It's odd to me that there's not any mention of what would happen under the agreement, given that the consent decree commits to obligations post-2018. It's just very odd that there wouldn't be something in that consent decree specifically addressing what was going to happen to this agreement. Right. And without that, your honor, I think the law says very clearly that the 1968 agreement has ended and you can't use the consent decree to rescue it. It's the same criticism we might make of our predecessors about the 1968 agreement itself. It had a 50-year term, but no one has argued that there was some de facto extension or there was some other termination provisions. Neither the county nor anyone else has argued that it is, in fact, expired, that the termination has occurred, and under normal contract law, we would then be allowed to return to running our own system. No one is arguing that we're leaving the county out to dry. We would immediately violate the consent decree if we pulled up the gates between city and county limits and didn't allow the sewage to flow. Plus, they have the permits, right? The county has the permits and you'd have to get the permits. Is that right? Yes, your honor, but that, I think, is a red herring. We have permits, too. We have the operators and we can, in fact, get those permits if we, when we go back to operating our own system. Do you have any other questions? No. Thank you, Mr. Herzig. Thank you, your honors. May it please the court. Tony Osterlin on behalf of the Hamilton County Board of County Commissioners. Your honor, the district court has the power to protect the integrity of its consent decree and the unity of the sewer system within that consent decree. And as this court has said multiple times, that inherent authority is so powerful that it actually compels the approving court to retain jurisdiction over and protect the integrity of the decree. And respectfully, that's exactly what Judge Barrett did here. The order should be affirmed because it properly, the court properly exercised both its express and its inherent authority to extend the MSD operating agreement until mediated or litigated for two separate and independent reasons. First, to prevent city actions that would have violated the consent decree. And second, to prevent the city's attempt to secede from MSD and unilaterally modify the consent decree. Now, those weren't directly addressed as to what those final outcomes would be. Instead, as this court correctly recognized, Judge Barrett stopped it and said, we need to have an orderly discussion of how this is going to happen. And that's what he did when he extended that agreement. Now, I think just a quick overview of the consent decree itself might help sort of frame the situation. Since being entered in 2004, the consent decree has governed a single sewer system. And it's defined in the consent decree as the MSD sewer system. The MSD sewer system is the county sewer district. That's how it's defined. There's one sewer system, and there always has been. The consent decree is divided into phases. We've just completed phase one of the consent decree in 2018 at a cost of a little over $1 billion in 2006 dollars. Phase two of that decree is going to start up in 2020. That's estimated to cost a little over $2 billion in 2006 dollars. So we still have 2 thirds of the consent decree to implement at a real today's time cost of over $4 billion. And it's all premised on all county rate payers contributing to the MSD assets and the MSD revenues. Now, in 2016, the county and the city asked the court to mediate this upcoming expiration of the 2018 operating agreement. And we did. We reached a resolution in 2017 that we hoped would work. All operations were going to transfer to the county. The county would take over all of the MSD employees. All we had to do was get a couple of minor state law changes. Unfortunately, in late 2018, about a month before this operating agreement expired, we learned that the state wouldn't support our efforts. So Judge Barrett was literally left with weeks to come up with a solution when we had previously spent years trying to come up with a solution. In fact, we filed our motion with only 10. We tried to work it out with the city. We said, let's just extend the status quo while we'll continue to mediate. And the city really gave us two options. Its first option was, we're going to leave your sewer system, we're going to create our own sewer system, and we're going to take all your employees. Or we'll extend your operating agreement if you waive your contractual authority and your statutorily prescribed authority. Now, the first option would have violated the consent decree, and the second option was illegal. So we went to Judge Barrett on an emergency basis. There were 10 days left before this agreement expired. He heard us. As extended. As extended. As extended. 10 days left. He heard us on an emergency basis. He issued an order the next day. And contrary to what Mr. Herzog said, there were facts before the court. In fact, the court had mediated this issue, or the court had overseen the consent decree since 2004. It was our mediator. Judge Barrett was our mediator. He participated in everything with us. We also submitted affidavits with our motion. And he had a robust factual record before him. He knew that operating agreement was going to expire. He knew that the city had made at least three explicit threats to leave the system, take consent decree assets, and take employees. And as Judge Rogers recognized, he knew a couple of other facts as well that we had put forth. That the environmental permits are in the county's name. That the city can't, without an express grant of authority under state law from the county, expend any sewer district funds. It can't collect sewer district funds. It can't spend them. It can't let contracts without our authority. Absent court intervention, the county wasn't in a position to operate or staff the metropolitan sewer district. And he knew that the $900 million in debt that was currently outstanding could become immediately due and payable if the city's threat to secede and leave would become due. That's all part of the record. Judge Barrett had that in forum. And given this, he said he was, quote, compelled to act for, quote, the necessary protections of the requirements of the consent decree. He said the city's threat to leave was not workable and threatened the implementation of the consent decree. And he said the city's threat left him with, quote, no choice but to extend the MSD operating agreement. And I agree, Judge Rogers, when you had asked, you had said, you questioned whether this was a temporary one or not. Or Aaron said it was permanent. You said, I think it's temporary. And I agree, it's temporary. Judge Barrett said, we're going to mediate? Or are you going to come back to me and we'll set up a litigation schedule? Now respectfully, I think we haven't advanced much over the last 10 months, probably waiting for this appeal. I think Judge Barrett's probably waiting to make sure that what he has done is acceptable to this court. Because frankly, any decision he makes next is probably going to be based on what this court decides. And while the mediation isn't progressing well, the litigation aspect is. As Aaron mentioned, it's happened after the appeal was filed with this court. But the county did file a motion to move on and find a permanent solution. And that's currently pending before Judge Barrett. And although the city didn't talk about this, we did brief this in our case. This case is very similar to a case that you've heard before, the Loveland case. And the city of Loveland case, Loveland had one small plant in the MSD system. It threatened to leave, take assets out of the consent decree, and go its own way. And in downplaying that threat to you now, the city ignores, I think, four things that were incredibly telling, that it briefed in that case then. It said the district court was the sole forum capable of dealing with Loveland's, quote, attempt to secede. It said Loveland's intent is to take back control of a sewage plant that rate payers have paid to expand, that serves other communities, and would impact MSD and the consent decree. It said Loveland's prior system is gone, both figuratively and literally. It was legally subsumed into MSD, and has been physically subsumed through MSD improvements. And fourth, and perhaps most importantly, it said that Loveland's attempt to deconsolidate would, quote, disrupt the implementation and funding of the Clean Water Act consent decrees. That's what Judge Barrett was faced with. The city was right then, the county, and the district court are right now. Is the board arguing any kind of a stop or a latches here like they did in the Loveland case? We haven't had an opportunity to do that yet, your honor. But I think, I'll come around to that, but you asked if the consent decree discussed the 1968 agreement. And it does, just in one spot. First, the decree provides that the defendants acting through the MSD sewer system have overflows in the MSD system. So it talks about one sewer district. The county established that MSD and acts as the principal of MSD. The city, pursuant to an agreement with the county, serves as the agent for the county in operating MSD. And that is the only place that that 1968 agreement is mentioned in the consent decree. It says, and only in this capacity is the city in the consent decree. So it's only in the consent decree as the county's agent. Now, even though the 1968 agreement isn't mentioned anywhere else in the consent decree, dealing with it is, and we haven't briefed this to the judge yet, but you asked a question, Judge Bush, the consent decree has a modification provision. It's paragraph 2.c, and it says if either the county or the city seek to name a successor in interest, or assume any or all of their interest in or operating role with respect to the consent decree, they have to seek a modification of the decree. So respectfully, even though we've not briefed this to Judge Barrett yet, the city does have an out from the 1968 agreement. It's a modification of the consent decree. Otherwise, I think the court certainly has the power to extend that and to- You briefed that, though, here. We briefed it here, but not before Judge Barrett. Okay. I would just like to make a quick comparison to the Loveland case as well. Because the city's threat to succeed, they pointed out to you that they basically blew that off. They said, look, that case is nothing like this because Loveland wasn't a party to this case. But it ignored that there's only one consent decree, one sewer system, that they're in this only as their agent. And a comparison between the city then, or the city now and Loveland then, I think is very telling. Both consolidated assets into MSD. Both had contracts that predated the consent decree. Both threatened to unilaterally take- The Loveland contract, though, had not expired, right? It did not have a termination date. It gave it, it could terminate it basically upon call. It could terminate it at any time. Both sought to change their role under the consent decree. Both said that they would satisfy their consent decree obligations. And the court told both of them that their obligations extended beyond their boundaries. And neither Loveland nor the city filed a motion to modify the consent decree. Given the consent decree MSD assets and rate payers inside city boundaries, this case is just like Loveland but on a massive scale. Instead of involving a small single plant community of about 10,000 people, it involves multiple plants in a community about 30 times larger than Loveland. Handling flow that the city has told you handles about 92% of all the flow in here. Respectfully, Judge Barrett had to deal with this. And the logic of Loveland still stands. You can't rip apart the sewer system when two-thirds of the consent decree still must be implemented. The reasoning is the same here. And Judge Barrett properly act to prevent an emergency, to ensure that any change occur in an orderly fashion over time through the mechanisms established by the consent decree. And that's all I have unless you have any questions. Thank you. Thank you. Your honors, I think Mr. Osterlund's argument points out exactly the implications of their argument. The county says that unity is necessary for the consent decree to be complied with. If that's true, why didn't the party say so when they wrote the consent decree in 2004? The 1968 agreement precedes it. The case law that you have on these issues says very clearly that you don't just assume an amendment or modification by parties without them in fact saying so expressly. So I think whether Judge Barrett wants, wanted to, I agree with you Judge Rogers, Judge Barrett wants us to get on with it at some point, but I also agree with Mr. Osterlund that I think now he's waiting for this court. That said, while he might not have seen the implications of what he was doing by saying just keep doing what you're doing. That is the legal implication that apparently in 2004 without our knowledge, consent, without a word in the document, we amended the 1968 agreement. The implications of that are pretty startling. The city made very clear in the 1968 agreement and the ordinances that it passed at the time that its elected leaders passed, that the property that the city was bringing to the 1968 agreement was only for the use of the sewer system. They were not giving the property. They were not dealing it over. It was for the use of the sewer system. Apparently then in 2004, without its knowledge, without anything in writing, without any word in the consent decree, the city also permanently gave its property to the county. Without fair compensation, essentially a taking, and did it unbeknownst to itself, because if we're never allowed out of the 1968 agreement, then the county has our property too, because the consent decree apparently is only complied with if we are unified. It simply is backwards to say something that comes in 2004 amends something in 1968 without ever saying so. That's certainly not what the parties bargained for. And consent decrees, while they are many things, are contracts. And the parties use the words of the contract to govern their relationships. Mr. Osterlin talked about the fact finding, or the facts that were available to the court. Certainly there were many facts available, but this was not an evidentiary hearing. And I think what you'll see in the short decision is no real discussion of what those facts are, or an understanding or discussion of the issues that we have here today. Mr. Osterlin points out that section three, he said 2.C, I think he meant 3.C, talks about what happens next. That's exactly what we point to, to say that yes, everyone that signed the consent decree knew that someday management might change. And section 3B and C give the court the ability to make those changes. The city of Cincinnati is not the Loveland case. First and foremost, Judge Bush, because of course there isn't this latches argument, which is what both the district court and this court hung its hat on. But also because, of course, the city of Cincinnati negotiated the consent decree and is a defendant in it. It has made no effort to say that it will not comply with the consent decree. And I think if you look at the declarations in the record below and our briefing, you'll see that the city has said unequivocally that of course it cares about the Clean Water Act and complying with the consent decree and will continue to do so. So I don't think Loveland governs this particular situation at all because the consent decree compliance is not at risk. It simply is not. The idea that the county put forward to the judge that the judge agreed with is this idea that there is unity in the system and it is forever unified. The last thing I'll point out on the consolidation argument that the county makes in its briefs in here is that if the county's argument is correct that the moment we signed the 1968 agreement, we consolidated into their system. We also, unbeknownst to the city, in fact became permanently part of the county system. So the moment after that document was signed, the county could have taken over the city's property permanently, even though we said it was just for our use. It could have fired the city and put in a new manager and said, thanks for all your assets, thanks for your employees. But we don't need you anymore. If consolidation is permanent, then it was permanent the moment the 1968 agreement was signed. There is nothing in Ohio- The order says that? No, I think the implications of the law here say that. And I think, no, what I'm pointing out is the county's consolidation argument means precisely that. No, Judge Barrett didn't get into consolidation, but that's the second reason why the county believes that the Loveland decision applies and that this decision is correct. And I do think, given the state of play here, that anything that this court were to decide that suggests at all that the court has this kind of power. When, of course, in consent decrees, they're supposed to narrowly tailor their remedies to any particular violation that may occur. And this has not been narrowly tailored at all. I think any decision of this court needs, if it wants to affirm what the court below did, needs to do so extremely narrowly. Otherwise, when you look at record 1649, you're going to see what the county's next view of things is. And you heard it here today, that we are simply a unified system, and the city really isn't part of it any longer. I see that I'm outside my time, your honors. Thank you very much. Thank you. Thank you, counsel, from both sides. The clerk may adjourn the court.